# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 17, 2003 Session

## STATE OF TENNESSEE v. SIPHACHANH SIPPY SYHALATH

**Direct Appeal from the Criminal Court for Wilson County**
**No. 01-1361     J. O. Bond, Judge**

---

**No. M2002-02123-CCA-R3-CD - Filed September 5, 2003**

---

The Wilson County Grand Jury indicted the Defendant for one count of especially aggravated robbery, two counts of aggravated robbery, and two counts of aggravated assault. Following the trial court's denial of the Defendant's Motion to Suppress evidence, the Defendant pled guilty, reserving a certified question of law. The issues before us on appeal are: (1) whether the certified question of law is dispositive of this case; and, if so (2) whether police had reasonable suspicion to stop the Defendant's vehicle; and (3) whether the police had probable cause to take the Defendant into custody and to search the Defendant's vehicle. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee and Richard J. Brodhead, Lebanon, Tennessee (on appeal), G. Frank Lannom, Lebanon Tennessee (at trial), for the appellant, Siphachanh Sippy Syhalath.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; P. Robin Dixon, Jr., Assistant Attorney General; Howard Lee Chambers, District Attorney General Pro-tempore; and Douglas Hall, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Facts

Early on the morning of July 28, 2001,[1] between seven and nine people were gambling in a house rented by Troy Perkins when one of them received a call on his cell phone. He immediately said he had to leave, but when he reached the front door, he was met by armed intruders. The intruders entered the house wielding guns and proceeded to rob the occupants, shooting Perkins in both legs in the process. Perkins testified that he ran out of the back door and crawled under a Winnabago, where he heard shots in the house and eventually observed three individuals exit the house, still shooting. He saw them get into a "little white car," drive out of the yard, turn right, and head eastbound. According to Perkins, it was "dusk dark" at the time, and he was unable to provide any description of the suspects, the make of their car, its tag number, or any identifying marks on the vehicle.

Dee Rhodes testified that he was in the house at the time of the robbery and that when he saw the first intruder enter he ran to the kitchen. From the kitchen, he saw the intruders shoot Perkins. He observed an intruder in the kitchen holding a gun with a long clip to the back of a man who was stretched out on the floor. He described the man with the gun as a foreigner and a "small type fellow," and reported that he saw the outline of the intruder's face, despite the intruder's mask. Rhodes stated that although he did not see the other intruders, he could hear them and identified them as African-Americans from their voices. He testified that the intruders stole $1,800 and two checks from him and that they entered and exited the house through the front door. He did not see the car in which they left, but testified that it had a "loud sound."

Sergeant Jeff Nester, an officer with the Lebanon Police Department in Wilson County, testified that he received a call around 5:00 o'clock in the morning on July 28, 2001, about a possible shooting in the area located near an establishment called "Les's Lounge." He stated that he arrived at the scene at 5:02 a.m., and he checked the lounge, but found nothing. Thereafter, on a tip about a party, the Sergeant went to the house that Perkins rented. There, the officer found Perkins, who appeared to have been shot twice in the lower extremity area.

After tending to Perkins's injuries, Sergeant Nester testified that he took a statement from Dee Rhodes at the scene of the crime. Rhodes relayed to the sergeant his account of the events, and, according to the sergeant, also told him that Rhodes found some shell casings in the back room of the residence. Sergeant Nester testified that the witnesses at the scene told him that the getaway car was white and contained three or four individuals, three of whom were African-American. Sergeant Nester further testified that the victims described the direction of the getaway vehicle as east, away from town and into the country. On the suspect description sheet that Sergeant Nester later filled out, he described the race of the non-African-American intruder as "white," even though Rhodes did not specifically state that the intruder was white.

---

[1] There is some discrepecency in the record as to whether the events occurred during the early morning hours of July 28th or 29th. The police officer testified that the events occurred on the 28th and the arrest warrant is dated the 28th, therefore, for purposes of this opinion the events occurred during the early morning hours of July 28, 2001.

Sergeant Nester called dispatch and requested a "BOLO"[2] to notify the county about the getaway car. The BOLO described three African-American males and one white male. Sergeant Nester explained that the term "10-39" that accompanied the "BOLO" meant that the suspects could possibly be "armed with a weapon." The "BOLO" included the time that the suspects allegedly committed the crime, approximately 5:05 a.m.

John Everett, a deputy with the Wilson County Sheriff's Department, testified that he received the "BOLO" for three African-American males and one white male in a small, white car shortly after 5:00 a.m. and that he arrived in the area near the house that Perkins rented around 5:20 a.m. He stated that he parked in the area and was there five or six minutes when a small, white car passed him. He followed the vehicle and noticed it had a license plate registered in Rutherford County. The officer testified, "[W]hen I got close enough that I could see the inside of the vehicle I only saw actually three people . . . inside the vehicle . . . ." The officer testified that when he saw the vehicle daylight was beginning to break, and it was becoming light.

Deputy Everett reported that at 5:34 a.m. he initiated a stop of the vehicle approximately one mile south of the location of the house that Perkins rented. Thereafter, he contacted Deputy Mark Jones, who was also with the Wilson County Sheriff's Department, to confirm the details of the previously issued "BOLO." After Deputy Everett initiated the stop, Deputy Jones arrived, followed by two other officers. Officer Everett testified that the three officers "[D]id a felony take down on the vehicle . . . for our safety because [the alleged crime] involved . . . a shooting, [the suspects] were supposed to be armed, this vehicle matched the description and for our safety we g[ot] them out without approaching the vehicle, we ha[d] them exit the vehicle and come back to us where we c[ould] see their hands." He continued, "After we got everything secured we went up and cleared the vehicle to [ensure] that there [were no other] occupants."

Deputy Everett testified that three males got out of the car, including the Defendant, whom he believed had been seated in the front passenger seat. The officers patted down the passengers one at a time and then put them in the back seat of different patrol cars. The Defendant was seated in the backseat of Deputy Everett's car. Deputy Everett did not question the suspects at that time. He testified that although people normally act nervous when they are stopped by police officers, the car's occupants "just didn't seem specifically nervous that they were pulled over." Instead, he stated that "[T]hey just didn't seem to act like somebody normally does." Deputy Everett testified that he did not arrest the Defendant, and did not hear anyone ask any of the car's occupants for consent to search the car. Deputy Everett did not conduct the search.

The deputy stated that "at some point the hood [of the suspects' car] was raised and that's when Deputy Jones discovered the guns under the hood." Further, he testified, "At that point we notified Lebanon [Police Department] and stood by and waited for them to actually come and conduct the search. So Lebanon [Police] . . . Officer Brockman arrived first and conducted the search." Deputy Everett estimated that the distance from the robbery scene to the area where he first

---

[2]"BOLO" is a term commonly used by law enforcement personnel that stands for "be on the lookout."

observed the car was about five or six miles, and that it would take a driver traveling at a normal rate of speed approximately ten or fifteen minutes to traverse the distance.

On cross-examination, Deputy Everett conceded that although the "BOLO" advised him that the robbery suspects were headed eastbound, the vehicle he stopped was headed westbound. He stated that he "could [not] see in the car . . . well enough to positively determine how many people [were inside] but . . . knew for sure there were [at least] three people in the car." Deputy Everett admitted that he was not sure that there were four people in the car, as indicated by the "BOLO," but he did not rule out that possibility. Regarding his reasons for stopping the car, Deputy Everett first noted that the car seemed out of place because it was such an early time in the morning on the weekend and, therefore, there was little traffic on the road. Further, the car had a Rutherford County license plate, which was unusual. Finally, this was the only car that the deputy came into contact with that essentially met the description stated by the "BOLO."

Deputy Jones testified that he heard the "BOLO" and searched the designated area in his patrol car for the suspects. Deputy Jones also testified that Deputy Everett contacted him and stated that he had seen a vehicle that he believed matched the "BOLO" and asked Deputy Jones to verify the description. Deputy Jones tried repeatedly to contact dispatch to obtain further information regarding the description of the car or suspects mentioned by the "BOLO," and he received information that the car was possibly a Honda Accord and that the suspects were from Murfreesboro, in Rutherford County. Deputy Jones relayed this information to Deputy Everett.

Deputy Jones stated that Deputy Everett contacted him after spotting the car in which the Defendant was riding and told Deputy Jones that the car contained two African-American males and possibly a white male, that it had Rutherford County tags, and the vehicle's location. Deputy Jones told Deputy Everett that the vehicle location indicated that it was in route, via a "back way," to Rutherford County. He additionally told Deputy Everett that "if he wanted to go ahead and affect the stop based upon information provided [the officers could] . . . verify whether [the car's occupants were] possible suspects or not."

Deputy Jones testified that upon his arrival at the location where the Defendant's vehicle was stopped, he observed two African-American males and one Asian male, who, upon his initial observation, appeared to be a white male. The deputy testified that the officers decided to, and did, have the suspects exit the vehicle because the threat of weapons articulated in the "BOLO" and the shell casings that were found at the crime scene. He described the Defendants as "hanging their head[s], shaking their head[s], and they just appeared to [act] like they were expecting us." Deputy Jones testified that, based on the suspects' demeanor, the vehicle description, and the fact that the occupants of the vehicle matched the suspects' description, the officers detained the suspects. Further, because of the threat of weapons, the officers patted down the suspects to ensure the officers' safety.

Deputy Jones testified that during the initial visual search of the vehicle he heard an officer say that he saw a shell casing. Based upon this information, the officers "immediately began a check

for weapons based upon seeing the shell casings." Thereafter, he observed numerous fingerprints on the hood of the vehicle and observed that the hood "appeared to not be sitting [in a] natural" position. The deputy explained that, based upon his special training in criminal gang practices and extensive experience, he understood it to be the common practice of criminals to store their weapons under the hood of their vehicles. Therefore, the deputy suspected that there may be weapons under the hood of the suspects' vehicle and lifted the hood. The deputy found two handguns and a rifle under the hood of the car.

On cross-examination, Deputy Jones acknowledged that the "BOLO" mentioned that the suspects were headed eastbound and that the Defendant's vehicle was traveling westbound when it was pulled over. Deputy Jones also admitted that while one officer mentioned seeing a shell casing, he was unsure if it was even found or placed into evidence. Further, he acknowledged that the officers did not attempt to get a search warrant for the car before searching it. The deputy maintained, however, that the vehicle search was limited to areas where a rifle and handguns could be found.

Erick Brockman, a patrolman with the City of Lebanon Police Department, testified that he went to Les's Lounge in response to a call about a shooting. Finding nothing there, he was directed toward the gambling house, where he found the crime scene where one victim said the intruders were from Murfreesboro. Officer Brockman did not put this information in his report or provide dispatch with this information. Officer Brockman heard an alert for a white vehicle with "possibly three black males and one white male," and continued to the scene of the car stop. The officer testified that when Officer Jones lifted the hood of the car, he observed one rifle, a .380 caliber weapon, a nine millimeter handgun, and two twenty-five round clips. One of the smaller guns was loaded, and the other was unloaded. He also discovered a ring on the floorboard in the back of the car and a necklace and two rings in a rear ashtray, which he put into evidence.

Based upon the aforementioned testimony at a pretrial hearing, the trial court found that there was reasonable suspicion to stop the vehicle. When making this finding the trial court stated that:

> [There was a] white vehicle, three people inside the vehicle observed by the officer. He observed out of county tags. . . . He was in a rural area that's lightly traveled, the vehicle was on a road leading away from the scene. . . .
>
> [T]he officer saw a shell container in the vehicle. That's even more reason. The demeanor he said of the people, how they looked like they were expecting to get stopped, they weren't [shaken] up or anything, wh[en] a bunch of police officers come up and surround them and order them out at gunpoint, and said the demeanor was not that of someone who was nervous or anything. It did raise a question in their mind.

The trial court found that, while the non-African-American suspect in the vehicle was Asian and not Caucasian as the "BOLO" had indicated, the suspect was wearing a mask at the time of the

alleged offense and "with only the eyes . . . and the skin around his eyes showing" it is understandable that the suspect may have looked Caucasian rather than Asian. Further, the trial court found that:

> [S]hells, at least, inside the vehicle [were] observed. [The officers] saw where the hood had fingerprints and markings on the hood from hands, the hood wasn't in its proper position, indicating that it had been up or down. . . . The officers . . . on the scene where shots had been fired [stated that] . . . the shots had been fired in [a] rapid fashion, meaning that the [weapon] wasn't a semiautomatic, it was an automatic rifle fired according to one [witness]. He said he couldn't even count the shots that they came so fast. And [the arresting officers] knew that this had occurred from . . . what had been told to them.
>
> The vehicle is out on the main road, I think that the circumstances existed, I think that [the officers] did have a right to search the vehicle. And look under the hood, and look into the vehicle.

Accordingly, the trial court overruled the Motion to Suppress the evidence. The Defendant entered into a plea agreement with the State, and, when so doing, reserved the right to appeal a certified question of law to this Court. The trial court incorporated the certified question into its final order and stated:

> [T]his plea agreement expressly reserves the following certified question: Whether the stop, search and seizure of the Defendant and his vehicle violate the Constitutional protections of the Defendant, when
> 1. The initial stop of the Defendant's vehicle was not supported by reasonable suspicion to warrant the stop of the vehicle based upon the information and facts available to the Officer at the time the stop was initiated;
> 2. The taking of the Defendant into custody immediately upon the stop of the vehicle was not based on probable cause;
> 3. The search of the Defendant's vehicle, without a warrant, was conducted in violation of his State and Federal Constitutional Rights.

## II. Certified Question of Law

Because this appeal comes before us as a certified question of law, pursuant to Rule 37(b) of the Tennessee Rules of Criminal Procedure, we must first determine whether the question presented is dispositive. Tennessee Rule of Criminal Procedure 37(b) provides, in pertinent part, that:

> An appeal lies from any order or judgment in a criminal proceeding where the law provides for such appeal, and from any judgment of conviction . . . upon a plea of guilty [if] . . . [the] Defendant entered into a plea agreement under Rule 11(e) but explicitly reserved with the consent of the state and of the court the right to appeal

a certified question of law that is dispositive of the case and the following requirements are met:

(A) The judgment of conviction, or other document to which such judgment refers that is filed before the notice of appeal, must contain a statement of the certified question of law reserved by the defendant for appellate review;
(B) The question of law must be stated in the judgment or document so as to identify clearly  the scope and limits of the legal issue reserved;
(C) The judgment or document must reflect that the certified question was expressly reserved with the consent of the state and the trial judge; and
(D) The judgment or document must reflect that the defendant, the state, and the trial judge are of the opinion that the certified question is dispositive of the case . . . .

Tenn. R. Crim. P. 37(b)(2); State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988).  The record evinces that all of the requirements of Rule 37  are clearly met, and the only issue about which discussion is necessary is whether the certified question of law is dispositive of the case.  We have stated that a dispositive issue is one where the appellate court "must either affirm the judgment or reverse and dismiss.  A question is never dispositive when [the appellate court] might reverse and remand for trial . . . ."  State v. Wilkes, 684 S.W.2d 663, 667 (Tenn. Crim. App. 1984).

The certified question of law, as stated in the judgment of the lower court, is:  Whether the stop, search and seizure of the Defendant and his vehicle violate the Constitutional protections of the Defendant, because: (1) the initial stop of the Defendant's vehicle was not supported by reasonable suspicion to warrant the stop of the vehicle based upon the information and facts available to the Officer at the time the stop was initiated; (2) the taking of the Defendant into custody immediately upon the stop of the vehicle was not based on probable cause; and (3) the search of the Defendant's vehicle, without a warrant, was conducted without probable cause.  The State and the trial court both opined that these issues are dispositive of the case, and we agree.  The only evidence against the Defendant was obtained from the stop, search and seizure of the vehicle.  None of the witnesses could provide a detailed description of any of the suspects, and it is unlikely that they could positively identify any of the suspects.  Any ballistic evidence found at the crime scene would be traced against a gun or rife that was found in the search.  Therefore, should we hold that either the stop or the search was unconstitutional, the State cannot provide any evidence as to the guilt of the Defendant.  Accordingly, we find that the certified issue is dispositive.

### III.  Motion to Suppress

The Defendant contends that the trial court erred when it denied his Motion to Suppress, finding that the arresting police officers had a reasonable suspicion for the initial stop, and probable cause to take the Defendant into custody and to search his vehicle.  The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in State v. Odom, 928 S.W.2d 18 (Tenn. 1996).  This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise."  Id. at 23; see

State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

## A. Reasonable Suspicion to Stop

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, and Article I section 7 of the Tennessee Constitution, protect people against unreasonable searches and seizures. Therefore, we must first determine whether the detention of the Defendant by the police officers amounted to a seizure. If so, we must then determine whether the officers possessed an articulable reasonable suspicion for an investigatory stop under Terry v. Ohio, 392 U.S.1, (1968), and its progeny. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry, 392 U.S. at 19 n.16; State v. Hord, 106 S.W.3d 68, 70 (Tenn. Crim. App. 2003). The Supreme Court stated that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980); Hord, 106 S.W.3d at 71. Further, our Supreme Court has stated that "When an officer turns on his blue lights, he or she has clearly initiated a stop . . . and the [vehicle's driver is] 'seized' within the meaning of the Terry decision." State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993).

In the case under submission it is clear that the Defendant was "seized" within the meaning of the Constitution. The officers observed the Defendant and two other men in a vehicle. They conducted a "felony stop" where they requested that the Defendant and the other occupants of the vehicle exit the vehicle with their hands in plain view. Thereafter, they placed the Defendant in the back of a patrol car. We conclude that the stop of the Defendant's vehicle was a seizure under both the United States and Tennessee Constitution.

Next, we must determine whether the officers possessed an articulable, reasonable suspicion for an investigatory stop under Terry v. Ohio. Police may constitutionally initiate an investigatory stop of an automobile if they have reasonable suspicion, supported by specific and articulable facts, that the occupant or occupants of the vehicle has either committed a criminal offense or is about to commit a criminal offense. State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). When evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances. State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). This includes, but is not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain

offenders. Id. (citing United States v. Cortez 449 U.S. 411, 417 (1981)). A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him. Id. (citing Terry 392 U.S. at 21).

In the case presently before us, Deputy Everett received a call from dispatch at approximately 5:00 a.m. to be on the lookout for a small white vehicle carrying three African-American males and one white male traveling eastbound in the area near an establishment called "Les's Lounge." Deputy Everett arrived in the area where the crime occurred and parked at a nearby location. Shortly thereafter, a small, white car passed him, and he noticed that it had a license plate registered in Rutherford County. The deputy initiated the stop approximately one mile south of the location where the crime occurred. Given the totality of the circumstances–the early hour that the crime occurred, the lack of other traffic on the roadway at that hour, the fact that the Defendant's vehicle matched the description of the suspects' vehicle, the similarity of the racial make up of the suspects and the occupants of the Defendant's vehicle and the Rutherford county tags–we conclude that the Deputy's suspicion that the Defendant was involved in the recent criminal activity was reasonable. Therefore, the stop of the Defendant was not a violation of the Defendant's rights under either the United States Constitution or the Tennessee Constitution, and the trial court did not err by holding that the police officers had reasonable suspicion to stop the vehicle.

## B. Probable Cause

Because we have determined that the officers had reasonable suspicion to stop the Defendant's vehicle, we must next determine whether they had probable cause to place the Defendant in custody and to search the Defendant's vehicle.

## 1. Probable Cause for Custody

The Defendant contends that the police officers did not have probable cause to place him into custody. We find this contention is without merit. Upon a showing of probable cause to believe that a crime has been committed, and that the suspect of the investigation committed that crime, a custodial arrest may properly be made. State v. Crutcher, 989 S.W.2d 295, 300 (Tenn. 1999). Our Supreme Court has defined "probable cause" as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998).

The officers testified that, after conducting a felony stop, they placed the Defendant and other occupants of the Defendant's vehicle in the back of separate patrol cars to ensure officer safety. At that point, the officers had probable cause to place the Defendant into custody. The Defendant's automobile matched the description of a car which was used to escape the scene of a recent robbery. The occupants inside the Defendant's car were similar in racial makeup to the perpetrators of the robbery, and the Defendant's car was stopped in close proximity to the crime scene, on a route traveling back to Rutherford County, where the perpetrators of the crime were allegedly from. Further, the robbery was committed with a rifle, and the officers noticed shell casings inside the Defendant's car after it was stopped. Under these circumstances, the police officers had probable

cause to believe that a crime had been committed, and that the suspect of the investigation committed that crime. Therefore, the officers had probable cause to place the Defendant under custodial arrest.

## 2. Probable Cause to Search the Defendant's vehicle

The Defendant contends that the search of the automobile was an unconstitutional search which violated the Fourth Amendment and, as a result, the trial court should have granted his Motion to Suppress the evidence obtained in the search. Since warrantless searches and seizures are presumed to be unreasonable, the prosecution has the burden of establishing, by a preponderance of the evidence, that the search and resulting seizure were justified pursuant to one of the recognized exceptions to the warrant requirement. Coolidge v. New Hampshire 403 U.S. 443, 454-55 (1971); Watkins, 827 S.W.2d at 295. One such exception is a police search that follows a lawful arrest. Chimel v. California, 395 U.S. 752, 762-63; Watkins, 827 S.W.2d at 295. Upon a showing of probable cause to believe that a crime has been committed, and that the suspect of the investigation committed that crime, a custodial arrest may properly be made. State v. Crutcher, 989 S.W.2d 295, 300 (Tenn. 1999). When police officers make a lawful custodial arrest, they are permitted, as incident to the arrest, to search the person arrested and the immediately surrounding area. Chimel, 395 U.S. at 763. The rationale for these searches is the need to disarm the arrestee in order to safely take him into custody, and the need to preserve evidence for later use at trial. State v. Robinson, 414 U.S. 218, 234 (1973).

In cases where the arrestee is an occupant of a vehicle, police officers may conduct searches, contemporaneous to the arrest, of the passenger compartments inside the vehicle. New York v. Belton, 453 U.S. 454, 457 (1981). The Tennessee Supreme Court has upheld the validity of those searches even where the arrestee is neutralized in the back seat of a police car when the search is conducted. Watkins, 827 S.W.2d at 295-96. In Tennessee, an arrest is more specifically defined as:

> [T]he taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest.

Crutcher, 989 S.W.2d at 301 (citing West v. State, 221 Tenn. 178, 184, 425 S.W.2d 602, 605 (1968)). An arrest may be affected without formal words or a station house booking. Id. However, there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer. Id. at 301-02

Relying on this definition, it is apparent that the Defendant was arrested prior to the search of the Defendant's vehicle. The police officers placed the Defendant in the back of a locked patrol car and, thereafter, found shell casings in the Defendant's vehicle. Deputy Jones noticed that the hood of the Defendant's car had multiple fingerprints on it and was sitting in an unnatural position. Because of his extensive law enforcement training concerning gangs and gang activity, Deputy Jones was aware that this was a common place for criminals to store weapons. At this point, the Defendant

was under custodial arrest, and the officers conducted a lawful search of the Defendant's vehicle incident to his lawful arrest. Accordingly, we hold that the trial court did not err in denying the Defendant's Motion to Suppress.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE